Good morning, ladies and gentlemen. Judge Hamilton is with us remotely. Good morning. Good morning. And we'll begin with the first case, Protect Our Parks, Inc. v. Pete Buttigieg. Mr. Epstein? Thank you very much, Your Honor. I am here representing the appellants. We would like to reserve four minutes for rebuttal at the end of the time. The case at this time starts with one fundamental question, which is the degree of deference that ought to be accorded to the decisions below in light of the applicable Supreme Court precedent. We think that the case which has not been cited in the correct fashion that dominates this hearing is the situation in Overton Park, where the applicable language on the kind of discretion that has to be afforded requires that it be thorough, probing, and in-depth. This is an application of the arbitrary and capricious rules that developed under the Administrative Procedure Act, and it's clearly some version of a hard-look doctrine. And at the very least, what this requires a court to do when it sees that decision below is to conduct a substantial inquiry to see that the hard look has been given. So, Mr. Epstein, it would help me if you focused on the precise decisions that you're talking about, because we have a plethora of them in this case. No, I mean the decision that I'm referring to was Overton Park. I know Overton Park, but are you talking about the DOT's decision to add some lanes to the road on the other side? Are you talking about the City's decision to put the foundation in Jackson Park? Are you talking about, you know, which decisions are you actually focusing on? The simplest way to do this is you look in the Federal Register. They give a description of what was at stake when they began this inquiry, and it was done in ordinary English, and it says the question before us here is whether or not to place the Obama Presidential Center in Jackson Park. But that wasn't the question that the DOT had. That decision already had been made. No, it cannot. It is a decision that it necessarily has to face, because what happens is it comes up inevitably in the circumstances when you start to figure out what you're going to do with respect to the road system. That is essentially an integrated decision in which you have to figure out the transportation project, which not only involves the roads that are going to be altered, but also the roads that are going to be converted into a bike path and a walkway. So are you saying that the DOT had the ability to override the City's decision to place this facility in Jackson Park? I did not say that. What I said is as follows, is that what you're required to do in all of these cases is to ask whether or not, when there's a project which starts with the road but necessarily involves through constructive use and through foreseeable and indirect consequences, the placement of Jackson Park. You don't have the set of alternatives. You cannot define the space so narrowly that there's only one particular alternative that's available. This cannot simply be a question of whether or not we're going to place this thing in Jackson Park because the City wants it there. Throughout this entire argument, what has happened is all of the defendants have insisted that if we do not have the power to order, that is, the government does not have the power of the order to force somebody to build in another location, then that location is not to be considered. That is not what the law is. If that were the case, then in fact everybody could define their project so narrowly so as to indicate a specific location that there would never be any way in which to consider alternatives. But I'm still curious because they did look at three alternatives. They said, suppose nothing happens. The center isn't built, nothing happens. That's one alternative. There's another alternative that the park district gives the land to the foundation, but nothing happens to the roads. Now, as you've pointed out, I'm sure you're right, that there would be tremendous traffic snarls. I'm quite familiar with that area myself, but my knowledge to one side. And then there was the third alternative. But your position really is that the Department of Transportation should have somehow said, we're going to fix the roads in Washington Park, and then maybe if you build it, they will come or something like that. No, no, I mean, you think that they should, as I understand it, you think Washington Park would have been a better place. No, we said to the west of Washington Park, which was not on federal lands or in state lands at all, and which would require no approvals. We thought that was the alternative side. And so what we simply said is that if you look at what they have to consider and they have to take into account all of these alternatives, you cannot say that the program here is to build Obama Presidential Center in Jackson Park. They never sent a single word of analysis that we could detect anywhere in the record, which actually took a close look at alternative A. What they did is they gave you nine exhaustive examples on how you compare B and C, and this is like rearranging the deck chairs on the Titanic. The central question that they have to face is why it is that they could segment the process in this particular way so as to ignore the fundamental question. So you don't think that the argument that either the federal defendants are saying, or that the city is saying, or that anybody else is saying, that the National Environmental Policy Act and the similar statutes apply only to federal actions? No, we agree with that, but the question is what's the scope of the federal action? And what has happened is that... And it was the federal action to redo the road system. It's the roads, yeah. One of the consequences of which is necessarily to allow for facilitate the Obama Presidential Center. They can make the decision unilaterally that they want to place it there, but that's certainly not binding on everybody, and the moment it turns out that there has to be a review of what the roads are, they cannot narrow the inquiry so that they look at only two roads, Lakeshore Drive on the one hand and Stony Island on the other, ignore the closing of Cornell Drive, which is necessary to build the center, and then to say, uh-huh, what we do is everything here is a local matter. There have been a number of cases that have been cited on the question of what counts as a local matter, and the abstract proposition is surely true, that if there is something which is wholly financed by the local government and fully segregated from everything else, it will count as something that requires no federal review. But that basically has passed. This is not like the situation in Old Town, where in fact you were able to segregate the funds from the outset with the understanding, as Judge Easterbrook sold it, that if it turned out at any future time, what happened is federal funds were used to deal with the stuff in Goshen, Indiana, it would become a federal project. This is not like the situation in the Scottsboro case, got the wrong name, Scottsdale case I think it was, in which what they did is they had a project over the first three phases of which were done with extensive federal funds, and then they decided in the fourth stage, oh, we're going to do this locally, and what happened is the court was very emphatic that you cannot run that kind of a segmentation. This was not like the situation in the Minetta case, where what happened is the segmentation was able to take place only after they did an exhaustive examination, which made it perfectly clear that there was no pollution risk going from one part of the project to the other, so that the two things could be kept apart. In this particular case, you can't do that. Your argument seems a lot to me like an argument under which NEPA requires a particular substantive result. Now, there was a lot of process that went on. There are extensive studies, there are all sorts of things, and it's a little interesting to see this kind of argument being made since... We're not saying it requires a substantive result. So, what we're saying is they can build it here, and then if they don't want to build it at all, that's their business. And not only that, if they don't like the Jackson Park, the site that we have suggested, Western Jackson, Washington Park, it's perfectly permissible for them to find some other kind of a situation. So, Mr. Epstein, I'm having... Mr. Epstein, I guess I'm still having some... Can you hear me now? Hard. Can you hear me now a little bit better? I'm doing the best I can. All right. I'm going back to your answer to Judge Wood's first question about whether you think the Department of Transportation had the authority to reject the city's selection and the foundation's selection of the Jackson Park site. I thought you said no, yet your arguments at this point all seem to be to the effect that the Department of Transportation had an obligation to look at at least one and perhaps several other alternative sites, whether limited to the south side of Chicago, Chicagoland, or the greater Midwest. I don't know. And that the Department of Transportation should have refused to use federal money to help the Jackson Park site. Is that right? It's the second alternative that we're putting forward. It turns out that the situation, surely the case that the federal authorities do not have the power to compel the Obama Foundation and the city of Chicago to locate the land anywhere else. But so long as they are required to consider prudent and feasible alternatives, the project cannot be defined down to a single location so that no alternative is feasible or impractical. But then they do have the power, in your view, to have prohibited construction in Jackson Park. That they do. But what happens is that this case is very different from the public citizen case, in that case, there was no point in going. Wait a second. I thought you told Judge Wood at the beginning, they did not have the power to prohibit that site choice. Now you're saying they do. No, I did not say that. Let me make it clear once and for all. The argument that we reject is the view that somehow or other, you do not have to consider prudent and feasible alternatives when it turns out that the federal government or this does not have the power to order the state or the Obama Foundation to take these alternatives. If that were in fact the case, then the entire prudent and feasible test would be completely eliminated, because virtually every site that you see in virtually every case is one which is optional. The only time in which there would be a constraint is under those circumstances, like in public citizen, where it turns out there's a federal prohibition which makes it impossible for this to take place. And there, what Justice Thomas said in his opinion, is you do not have to go through the rigmarole associated with the NEPA statute, because there's nothing that you could do to force the federal government to take it. But here the options are open. Why can you hear? It seems to me we're talking about ancillary expenditures, not the building of this. If no one were taking federal funds at all for these road projects, then you wouldn't be here, I don't think. That's right, but they are taking you know, rather than fuss around with this, they chose Jackson Park, that's where they want to be. Why does the Department of Transportation have to suddenly offer an option from, you know, up in Wilmette? That's not where they want to go. Justice Thomas, as he then was, in the Boese case, made it pretty clear that there's a kind of rule of reason which determines the scope of the feasible alternative. At one point, quite explicitly, he says, you cannot define this so narrowly that there's only one possible site that's eligible, because it utterly defeats this action. But you're taking as a given that there is federal control over the siting of the Obama Presidential Center? No, we are not. We are taking for given that it turns out that in order to cite that, like any other project, they have to meet the requirements associated with NEPA and with the Transportation Act. But they're not allowed to look at the world as it is, where the decision has been made to put it in Jackson Park? No, they are not allowed to do that. If it turns out that in order to facilitate this, they have to take several hundred million dollars of federal funds, use those monies in order to close and to build roads. This is not like the Old Town case where they refused the money. This is a case where the money has already been accepted. But there are lots of different ways they could reconfigure the roads. Not if, no, so long as there are joint costs associated with these various three situations, then you have to treat all three parts of this as a single project. And if they're part of a single project, then what you have to do is to look at the various indirect consequences that are associated with this, the constructive use, none of which was done in this particular case. The entire argument in this particular case is that this was a local decision. But the definition of a local decision that they use is far broader than that which has ever been used in any of the other cases that have been decided. So our position is perfectly straightforward. They're taking large numbers of it is not the case under NEPA or under the Transportation Act that federal funds have to be the exclusive source of money. But in order to avoid degrees of serious evasion of the statute, you can't take a huge pot of money and then say, oh, after the fact, we're going to say it went here rather than there. So you disagree then with the way the D.C. Circuit came out in the Sierra Club case with the Keystone XL pipeline, which was, again, a mixed? There are two pipeline cases, and I think it's very important to understand the radical difference between them. The first situation that we have is one in which you're trying to do an initial approval project where there's nothing wrong and malfunctioning associated with the pipeline. And what the court said, although it didn't quite say it, I think, in the correct fashion, is that we know that every other segment of that pipeline is going to be subject to state reviews fairly extensively. It would be utterly pointless under NEPA to say that you can't use a segmentation analysis, so the federal government has to examine the whole pipeline before it could pass on the soundness of the other. They can rely on the others. But when it gets to the Delaware Rivers case, it's completely different. Now there's a malfunction with respect to the system, and the malfunction in one place will spill over to another point. So at that point, it is no longer permissible to decide to segment the policy. What you have to do is to follow the consequences where they go. And this case is like the second case, not like the first case. This is a situation where everything that's happened is completely independent and integrated. It also is very different from these cases than another effect, which is when you locate the Obama Presidential Center, it doesn't have to hook up with anything. This is not like the Toledo Airport that takes place in Bucy. You could have put this any place. So all we're saying is that the appropriate scope for examination is not one that we determine. It's one that the Obama Foundation determined itself when it says we're looking at three sites on the south side of Chicago. But then they stopped looking at the other two. Well, that's okay. But the question is not whether or not they did or did not stop, but they can't unilaterally avoid the NEPA statute. But they were not using federal funds at that point. They are using federal funds. Well, once they decide on Jackson Park, yes, they want some federal funds. They use all these There's huge public funds going into everything. There are funds that are going into each and every part of this particular expenditure. And what they cannot do is to say, well, we're putting these funds here and those funds too. This is an effort to sort of artificially segment in these cases. And what happens is you don't have any of the complications that you have when you have fixed sites that have to be drawn to other fixed sites. All we are using the south side for was to try to find a definition of what's the reasonable area for inquiry consistent with what Judge Thomas said in the Boosie case. And it is not unreasonable to say that we should be able to examine the very sites that they did. The fact that they gave up the examination and tied one thing means that unilaterally they can completely defeat the application of this statute by moving in one direction. I'm going to stop here, Your Honor, because I see that I'm down to... You're down to your rebuttal. I will stop. Thank you. Thank you. May it please the court, counsel. My name is Alan Brabender and I represent the federal defendants in this case. Let me just start by explaining what the plaintiffs are doing and what they did in their briefs as well is confusing Section 4F with NEPA. They confuse and conflate the two statutes, but the two statutes are different with different requirements. One way in which they conflate and confuse NEPA and Section 4F is by failing to recognize that the baselines for the analysis are different. For NEPA, the baseline is essentially alternative A in the environmental assessment, which considers the fact that the center has not been built, the roads have not been closed. That's the baseline for the NEPA analysis. The agencies did, I know they mentioned a couple of times in their reply brief, say that the agency didn't compare alternative A with alternative C with respect to traffic impacts. They did do that and I would refer the court to supplemental appendix pages 128, 129, 390, 391, 398, and 399. So Mr. Brabender, what I understand sort of the essence of the plaintiff's argument to be is that there's a certain amount of leverage that the federal agencies have. And so, if the Department of Transportation says we're willing to finance all this road construction, rerouting, facilitating the use of Jackson Park for something, and that something happens to be the Obama Presidential Center, then that is in fact one step removed from a federal decision to build the Obama Center where it is. And so, people being kind of predictable and rational beings, if somebody says, if you build in Jackson Park, here's this big federal subsidy that's going to be there to facilitate your project. If you build it someplace else, that big federal subsidy isn't going to be there. That people, that there is in fact a federal voice in where this center is located. That's right, Your Honor, and the federal agencies recognize that and that's why the agencies considered the impacts of the center and the center construction to be the indirect consequence of their own federal actions and then examine those impacts in the environmental assessment. So, no impacts went unexplored. So, PLANTA's primary claim is under the National Environmental Policy Act, NEPA, and their central theory is one of segmentation. It is, and so I would also like you to talk about, they are very interested, of course, in the Administrative Procedure Act aspect of this. You know, did the agencies behave arbitrarily, capriciously, unreasonably when they conducted that NEPA assessment? Is it a compliant NEPA assessment? I realize in the end, NEPA is not a substantive statute. NEPA is a process statute. Sometimes people wish it were more substantive, but it isn't. It's a process statute, but if you can explain how you see those two threads weaving together, the APA side of things and the NEPA side of things, that would be helpful. Well, with respect to the decision not to prepare an environmental impact statement, I think that's... Maybe that's the key decision. Right. And so, under cases such as Kleppe versus Sierra Club, which is a case this court cited in its earlier decision, the decision not to prepare an environmental assessment is owed special competency under both NEPA and the APA, and it's owed deference. So here, that deference is earned and deserved, because the federal defendants took a very hard look at the impacts of their actions, as well as the indirect impacts, such as the building of the center. They prepared numerous very technical documents on the impacts, and then applied their... Things like the tree appendix? That's correct. There's a lot of detail in that tree appendix. And then applied their impacts are not significant. Again, that's owed deference under the APA. Or at least not significant enough to prevent the project from going forward, even if you thought they were significant. If you look at cases like Winter against Natural Resources Defense Council, I mean, they can be very profound, and yet the interest in going forward might still prevail. Right. And it's important to remember, as Your Honor is, that this is a preliminary injunction appeal. And so even if the plaintiffs could show that they're likely to succeed, there are other factors that need to be considered, such as in Winter, the Supreme Court found it was not in the public interest to enjoin naval exercises, even though the Navy was found to be in violation of NEPA. And the same is true here. The federal defendants didn't brief the other factors, but the foundation did, and we agree with that analysis. The plaintiffs make many claims under many statutes. So just to be clear, I mean, a little bit what I was discussing with Mr. Epstein, it's your position that once the decision was made by the Obama Foundation to put this center in Jackson Park, all legal obligation or even option to look at sites other than that disappeared. Is that your position? That's correct, for different reasons under different statutes. Plaintiffs like to lump them all together, but different analysis applies to different statutes. At the risk of maybe lumping them all together, though, I guess my concern, counsel, is it at least I understand the point is to be saying, in essence, the federal government agencies allowed the city and the foundation to paint those agencies into a corner, to not be able to look at any other alternatives, other than simply refusing to go along. We're not going to provide any subsidies at all, or we are and we'll help you out with the site that you've chosen. And that, I guess the kind of painting into the corner situation just seems, strikes me as odd, given the federal government's power over its own money. Well, the federal agencies were not painted into a corner. As Your Honor recognized, the agencies could deny the requested funding or deny the conversion if the statutory requirements were not met. But under the UPAR Act and the Federal Aid Highway Act, the way Congress structured those statutes, if the statutory prerequisites are met, the Congress expected the federal agencies to grant the assistance. And that's in distinction to NEPA, because as I understand NEPA, you could have an assessment saying that it's terrible to cut down all those, the 800 trees, et cetera. And the federal agency would still be entitled to say, okay, we're doing this with eyes open, but we're going to move forward. That's correct, Your Honor. NEPA prevents uninformed decisions. It doesn't prevent unwise decisions. And 4F, you're saying it's different, 4F. Section 4F does have some substantive elements. That's right. And the district court correctly found that the federal defense did comply with Section 4F for looking out alternatives to the transportation improvements. But Section 4F does not require the Federal Highway Administration to look at alternatives to building the center, because the center is not a federal action. And even if it were a federal action, it's not a transportation project. So Section 4F wouldn't apply to the center. That does sound like rather segmented thinking, though. I mean, here's this, it's not a transportation option, but it requires transportation changes. That sounds like only building a railroad station or something would count. Well, no, because the Federal Highway Administration did recognize that the transportation improvements associated with the center were, in fact, transportation projects, and then looked at alternatives to those improvements. But the center itself is not a transportation project that has the purpose of promoting the movement of goods or people from one place to another. Its purpose is to memorialize a president. And unless the court has any additional questions for me, I will yield any remaining time to the co-defendants. Thank you, counsel. Mr. Worsak. Good morning. Good morning, and may it please the court and counsel. My name is Andrew Worsak. I represent the City of Chicago, and I am also arguing today on behalf of the Chicago Park District. And I would just like to spend my time focusing on two fundamental points that I think help frame some of the more particular issues in the case. The first point is that the decision to locate the Presidential Center in Jackson Park was fundamentally a local decision. So can I ask, I should have asked Mr. Brabender this, it suddenly popped into my mind. Does the record show at this stage of the game roughly what portion of the entire project, sort of start to finish, is going to be private funds, how much is going to be done by the federal government or the city or the park district or anyone else? I believe the record speaks to that in various respects, Your Honor. One document that speaks to that is the use agreement that was entered into between the city and the foundation, and that is part of the record, I believe. It's part of the appendices to the city's UPAR submission, which is record 61-10. And that document provides a note in certain terms that the Obama Presidential Center will be paid for and built by the foundation. Upon completion, those buildings will then become the property of the city, but the foundation will be paid. Then they get the land free as long as they continue as a Presidential Center, is that right? Yes, subject to the use agreement, I believe there's a $10 payment also under the use agreement for use of the land. Great. So, I mean, and this, the number, you know, $700 million sticks in my mind somewhere, some amount of money, there's an estimate of how much they're going to have to raise to build it. Yes, the foundation was required to submit documents to the city regarding its construction costs and having certain monies and... But then the DOT expenditures on the road replacement are in addition to that, right? Those expenditures would be solely for the transportation improvements, for the alterations of the roadwork network within Jackson Park. And since we're on that subject, I would just like to clarify something that I think was confused by plaintiffs. The font, if you will, the starting point for analyzing the roadwork enhancements and improvements is the text of the federal statutes authorizing the disbursement of the federal funds. And those talk about transportation projects, and that's a defined term. And the location of the center and the closure of roads, the closure of roads, not the expanding of roads, those are not transportation projects. So those are not even in the ballpark with respect to the decision that was put to the Federal Highways Administration with respect to whether to authorize or not authorize the availability of federal funds for the transportation improvements. The question... But the city, somebody had to authorize closing down that portion of Cornell Drive and putting up the fencing and all the rest of that. Yes, that was authorized by the city pursuant to ordinance. So the question for Federal Highways was whether to authorize the transportation funding. They had to comply with Section 4F, which as the starting point for that analysis was the transportation project, not anything that came before. They said, okay, we have a proposal to do a transportation project. We have to look at alternatives, prudent and feasible alternatives that might avoid any use of 4F properties, meaning park land resources or historic resources. If we can't find a prudent and feasible way to do that, then we look at minimization and mitigation strategies, which they did through nine different iterations of different alternative configurations. They then found one that was prudent because it would address the traffic impacts while also minimizing the use of 4F resources. They then subjected that alternative to an even more refined analysis. So they wind up with like 9B. 9A and 9B. So it was an extremely sensitive analysis. It was focused on the transportation improvements as it should be, and as was the scope of the federal agency's authority under statute. So you're telling me that it would have been possible for the Department of Transportation at the end of the 4F process simply to say we don't see anything that complies with the statute and so we're not going to finance any road changes. Yes, if the city's proposal did not comply with federal requirements, it could have been denied. That would not have prevented the but that is a decision the agencies could have made. I see my time is almost at the end, so I would just like to make one last point that I think helps frame the NEPA impact question that was before the agencies. And that is that the agencies were well within their discretion and expertise to conclude that the Presidential Center would not create a significant impact because Jackson Park is a large dynamic urban park that has changed and evolved for more than a century to meet the public's needs. So is there a time period that's relevant for that no significant impact? I'm thinking of the trees, actually. Cut down 800 trees, you plant a bunch of two-caliber, 4.5-caliber trees, and 30 years from now, they'll probably be nice trees, but there's a period in between, right? So is there any necessary time frame or is it just whatever somebody wants to live with? Well, I think that's a question that would be committed to the agencies to use their expertise and discretion in resolving, and they explained extensively how they resolved that question. They pointed out, of course, that the number of trees being removed was fairly small in relation to the entire 550 acres of Jackson Park, and that the 83 percent of trees within the survey area would remain, and then, of course, the trees that weren't in the survey area but otherwise were in Jackson Park would remain, that those remaining trees would provide ample wildlife habitat as well as resources for the public to enjoy. If the court has no further questions, we ask that the decision below be affirmed, and I will yield to Ms. Flint. Thank you, counsel. Ms. Flint? Good morning, Your Honor. Casey Flint on behalf of the Barack Obama Foundation. Because this is a preliminary injunction appeal, I'd like to touch briefly on the public interest. As you observed, Judge Wood, in winter, the Supreme Court reversed a preliminary injunction, notwithstanding the likelihood of success on the merits, and regardless of the lower court's finding that there was a near certainty that irreparable injury would ensue, the Supreme Court said, because the public interest compels denial of a preliminary injunction, the end result of one was reversed. Well, the same is true here. We are talking about the Presidential Center- Except you don't want a preliminary injunction, obviously. Obviously. The public interest compels denial of a preliminary injunction here. This is the Presidential Center dedicated to the nation's first black president, the first president elected from the city of Chicago to a first lady who grew up blocks from the Jackson Park site. So you emphasize that, but actually, of what legal relevance are those things? Aren't we talking not about whether to have an Obama Center? I think we can all agree, fine, you know, presidents of all stripes have such centers, but where? So how does that help us on the where question? The City Council, which is, in its legislative role, its job is to identify the specific to the Jackson Park site, including the enhancement of Jackson Park. Right now, if you move from Stony Island and try to walk east to Lake Michigan through Jackson Park, you have to cross Cornell Drive, six lanes of traffic, also a large fence next to the lagoons. As a result of the development of the Obama Presidential Center, people will be able to walk on natural surfaces from the western edge of the park to the lagoons and all the way to Lake Michigan. Access to the park, accessibility to the park will be enhanced as a result of this construction. There will be benefits to the community, to Woodlawn, to the south side more generally. How does the access to the park, I don't quite understand, from the west of the park, there's already access to it? That's true. The roadway changes will enhance pedestrian access to the park from Stony Island and also the transformation of Cornell Drive from what it is now, a highway, which by the way is quite different from what it looked like in Olmsted's era, but the transformation of Cornell Drive from a highway to a pedestrian and bicycle promenade will make the park be connected in a way that it isn't now, so that a pedestrian can move from the western edge. Connected north and south, the park is. Yes. And east and west too, you're saying, from where the Midway Plaisance ends to Lake Michigan. Through the lagoons, not through the lagoons, around the lagoons to Lake Michigan. So there was some mention as well, I mean we have the, if you will, the downtown area museum campuses, but I thought that the city council was also talking about developing a south campus area. That's exactly right. The addition of the Presidential Center to the Jackson Park site will enhance the city's plans to develop a museum campus south, connecting to the Museum of Science and Industry, also in Jackson Park, the DuSable Museum, closer to Washington Park, and the University of Chicago. So that will be an integrated set of cultural institutions. And to respond to another question you asked, Judge Wood, about the 700 million dollar figure, that is the Foundation's private investment in developing the Obama Presidential Center. That is all money that will go to the public interest, because once the museum is completed, once the campus is completed, the city will hold title for the public to the buildings and to the land, which it's held title to throughout. And that, as I mentioned before, the legislature, whose job it is to identify the public interest of the city of Chicago, unanimously determined not just that a Presidential Center should be built, but that it should be built in Jackson Park. And for that reason, the public interest clearly supports denial of the preliminary injunction here. Thank you. Thank you, counsel. Mr. Epstein? Thank you very much. In the time that's left to me, I'd like to turn to the points that were just raised. First point that I would mention is when you're trying to deal with the substantive standards, it's pretty clear that there's a degree of integration, strong integration, between the Transportation Act and the NEPA Act in trying to figure out what is a suitable and we think that when you have a bunch of roads together, and it's necessary to create the foundation, that they're all part of an integrated project, which means that you then have to turn to the questions of various justifications for what's going on. And it turns out that at this particular point, we would like to stress that there is a duty on the part of the court to make a substantial inquiry to see whether or not the hard look has been given. And if we start with the illustration associated with the trees, what happens is that the conclusion reached in this case is one which has never been reached in any case, any time, anywhere in the entire history of the United States and NEPA. There are many cases that make it very clear that saplings are not the equivalent to trees. What we did is we indicated under these circumstances that all the stuff having to do with the protection of birds, the absorption of carbon dioxide, the control of water with respect to the it also turns out that... I had some trouble with this argument because it's not uncommon on construction sites that you've got to take down some trees. And this is, after all, a public park. This isn't something that's going to exist for five years and then vanish. Over the long haul, the trees will be replaced. In the long haul, we're all dead. This is 50 years before, if you're lucky, you will return to the status quo answer, if you're lucky. And why is that unlawful? Why can't the trade-off made by the... First of all, I have two questions. Why can't that be a permissible trade-off? But then secondly, to get back to the CLEPE question, why is deference to the agency's weighing of these factors not called for? Because what happens is there's absolutely nothing behind what they have said. You can look to every single case associated with this. In those cases in which the trees have been cut down, it's because there's been no alternative to what's going on. You have to repair a bridge, you must cut down a tree. You have to expand Yankee Stadium, you must cut down a tree. Why do you have to expand Yankee Stadium? Well, because what happens is, as you said, these are the projects that are being proposed and it turns out that these are perfectly legitimate projects. You look at various alternatives and they have to be physically contiguous. So what you do is you do that and then immediately you plant trees somewhere else. What they're doing in this particular case is calling something which lasts 50 years temporary. I think temporary basically is for one year. In the interim, there is going to be all sorts of chaos and headache. They claim that they're going to be able to put things back together again, but they will not be able to do that. You can't restore a woman's garden when all the environment around it has been destroyed. So it turns out that that is simply not feasible under the circumstances. Why should we take your word for what's feasible? We're willing to put, because it's not us. We have every single government agency which has every other project has taken exactly the same position. We are willing to give independent sources. There's absolutely nothing what the city has done to do this. What they are trying to do desperately, I think, is say we don't need to have an environmental impact statement because these things are transitory and short-lived. Well, it turns out the definition of transitory does not cover 50 years and the impacts are enormous. If you're trying to look at the balance, one of the things to understand about the Obama Presidential Center is it's a bridge, a road, or an airport. They could locate that in a number of different places. So the trade-off is building with better access in west of Washington Park or wrecking everything inside Jackson Park. If you're going to make a trade-off, this is not a very close trade-off. The only thing that they are interested in is trying to get the grandeur of a Park Avenue address. If it's trying to reach the crowds and the customers, you're better off near the green line and the expressway. If you're trying to avoid overall cost, it turns out building on solid land is infinitely cheaper than building where they are going. So there is nothing that can be studied which will actually commend this particular project. And when you look at all the dislocations, the issue here is always a balance of equity. And under these circumstances, the equity is all cut in one way. You cannot build it there because there are other options that are assigned. They talk about community development. There is no community development that could take place near Jackson Park, right? It all takes place near Washington Park. Thank you, Mr. Epstein. Thank you. Thanks to all counsel and the case will be taken under advisement.